IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LASHAMMERA THOMPSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:14-CV-03783-N |
| | § | |
| STONEGATE SENIOR LIVING, L.L.C, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

### <u>ORDER</u>

This Order addresses Defendants StoneGate Senior Living, L.L.C. ("StoneGate Senior Living"), StoneGate Post-Acute Management, L.L.C. ("StoneGate Post-Acute Management"), and Bio Care Home Health Services, Inc., d/b/a StoneGate Care Team's ("StoneGate Care Team") (collectively, "StoneGate") motion for summary judgment [53], StoneGate's motion to exclude summary judgment evidence [72], and Plaintiff LaShammera Thompson's motion for leave to file a sur-reply [73]. The Court grants the motion for summary judgment, denies the motion to exclude, and denies the motion for leave.[1]

---

[1]Thompson moved for leave to submit a sur-reply and additional evidence in opposition to the motion for summary judgment. "[L]eave to file a sureply may be granted . . . to allow the nonmovant a chance to respond to the movant's newly-asserted theories or evidence." *Lombardi v. Bank of Am.*, 2014 WL 988541, at *3 (N.D. Tex. 2014). Thompson did not identify any new arguments or evidence contained in StoneGate's reply that necessitated a sur-reply. The Court denies Thompson leave to file the sur-reply and disregards Thompson's supplemental evidence in considering the motion for summary judgment.

ORDER – PAGE 1

## I. THOMPSON'S EMPLOYMENT WITH STONEGATE

This case arises from StoneGate's termination of Thompson's employment.[2] StoneGate Care Team, an in-home nursing and rehabilitation services provider, hired Thompson, an African American woman, as a receptionist in March 2013, at the rate of $14.00 per hour. Thompson's initial job duties included answering the phones, assembling nursing packets, stocking the supply room, and delivering parcels. Thompson's immediate supervisor at the time was Rita Jasso, the Director of Nursing for StoneGate Care Team.

On July 25, 2013, Thompson overheard Jasso make several racially offensive remarks. Thompson reported the remarks to Human Resources. Kathleen Cloyd, the Chief Operating Officer of StoneGate Post-Acute, suspended Jasso with pay pending further investigation. Up until this point, Cloyd and Jasso had reportedly enjoyed a close and friendly relationship. Pl.'s App. 27–28. Nevertheless, Cloyd and Kyle Hooper, the Chief Operating Officer of StoneGate Post-Acute, ultimately decided to terminate Jasso's employment due to her remarks. StoneGate Care Team held a meeting during which management reviewed the company's anti-discrimination policy with all employees. Thompson testified that she was satisfied with these remedial actions.

Shortly after Jasso's departure, one of Thompson's coworkers, Brenda Santos, confronted Thompson at her desk. Santos apparently stated, "You're the reason why Rita isn't working here," and an argument ensued. *Id*. at 98–100. Cloyd, who was acting as

---

[2]The following recitation of the facts is drawn from Appendix to Defendants' Motion for Summary Judgment [54] ("Defendants' Appendix") and from Appendix to Plaintiff's Response [67], [68] ("Plaintiff's Appendix").

interim Director of Nursing, and another employee, Cristal DeLeon, came to stand in Thompson's cubicle. Hearing the commotion, Donnesha Hurd, Director of Client Services, walked over and asked Thompson to leave. After Thompson left, DeLeon then told Hurd, "If you wouldn't have said anything then she [Thompson] could have been out of here." *Id.*

Around the same time, Thompson approached Cloyd and inquired about a position as Intake Coordinator. The Intake Coordinator is responsible for receiving and documenting new patient referrals and scheduling patient care with a nurse or therapist. The Intake Coordinator must schedule a provider visit within 48 hours of a patient referral in order to meet Medicare guidelines and ensure timely patient care. Cloyd discussed the position with Thompson and pointed out that Thompson did not have any experience as an Intake Coordinator. Cloyd paired Thompson with Jennifer Collins, the Intake Coordinator at the time, for a day so she could observe the position firsthand. After watching Collins, Thompson told Cloyd she was still interested in the job.

On August 30, 2013, Cloyd promoted Thompson to Intake Coordinator and raised her rate of pay to $20.00 per hour. For three weeks, three different employees trained Thompson for the Intake Coordinator position. The training primarily consisted of shadowing other employees with experience as an Intake Coordinator. At one point, Thompson expressed dissatisfaction with the training she was receiving from one of the employees, Collins. Cloyd and Hurd substituted another employee in place of Collins for training, and Thompson made no further complaints about her training.

Thompson claims that, during her tenure as Intake Coordinator, Cloyd and other employees undertook a concerted effort to bully her and force her to leave StoneGate Care

Team.  Thompson testified that Cloyd "question[ed] everything she did," threw items on her desk, refused to speak to her, and acted in a dismissive manner towards her.  Defs.' App. 42–43, 71.  Thompson also claims that DeLeon increased her work load by requiring Thompson to handwrite referrals and sending her referrals late in the day.  Pl.'s App. 85–94.

Thompson maintains that Cloyd and other employees held a secret meeting during which they agreed that Thompson was not a "good fit," that she was "ghetto" and "hood," and that her data entry was full of errors.  *Id.* at 147–57.[3]  During the meeting, Cloyd allegedly disclosed Thompson's private medical information to her coworkers, including the fact that she had a prescription for antidepressants.  *Id.*  Cloyd also questioned Thompson's work attire and asked another employee whether Thompson was wearing panties.  *Id.*  This meeting apparently took place outside of Thompson's presence.

On September 30, 2013, a new Director of Nursing, Lisa Price, became Thompson's immediate supervisor.  Price was not a member of StoneGate Care Team at the time of Thompson's complaint against Jasso, and Price had no prior association with the company.  Shortly after taking over the position, Price made several changes to Thompson's working conditions.  She moved Thompson's desk closer to her office, causing Thompson to lose phone service for a day.  Price maintains that she moved Thompson's desk due to a recent incident between Thompson and another employee and to increase her involvement in the intake and referral process.  Defs.' App. 114.  Price also changed Thompson's lunch schedule

---

[3]StoneGate rightly objects to Thompson's use of imprecise citations to her appendix in support of her response.  *See* LOCAL CIVIL RULE 56.5(c).  However, because the Court grants summary judgment in StoneGate's favor, Thompson's imprecise citations are not prejudicial.

– along with the lunch schedules of thirteen other employees – to ensure proper coverage in the department throughout the day.  The new schedule did not change the duration of Thompson's lunch break, but it did move her break up by fifteen minutes.  Finally, Price created a policy that required all employees to submit a request and receive approval before working overtime.

Thompson claims that Price was complicit in her coworkers' attempts to bully her. Thompson maintains that Price moved her desk and changed her lunch schedule in an attempt to isolate her from her friends.  Thompson also contends that Price had no reason to change the company's overtime policy, and merely wanted to make Thompson's job more difficult. Finally, Thompson complains that Price told Thompson she "was having difficulty coping with the fact that [her] daughter was impregnated by a black man." *Id*. at 58–59, 72.

On October 11, 2013, Thompson became involved in an altercation with Cloyd. According to Hooper, on late Friday afternoon, Thompson had fallen behind on her patient referrals.  Because the office would be closed over the weekend, the failure to schedule care visits in response to the referrals had the potential to negatively impact patient care.  Cloyd and Price discovered Thompson's lapse and asked her whether the referrals were complete. Hooper learned that, at this point, Thompson "had become loud and belligerent towards these managers and had created a significant disruption in the office." *Id*. at 125–26.  On the following Monday, Hooper suspended Thompson with pay.  Five employees, including Thompson and Cloyd, submitted written statements regarding the incident.  On October 21, 2013, Hooper decided to terminate Thompson's employment.

Thompson now brings claims against StoneGate under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and Texas Labor Code § 21.055 for retaliatory termination and retaliatory hostile work environment.  StoneGate moves for summary judgment on all claims.

## II. THE SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense.  *Celotex*, 477 U.S. at 322–25.  Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return

a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. THE COURT GRANTS SUMMARY JUDGMENT IN FAVOR OF STONEGATE

Thompson asserts that StoneGate retaliated against her for reporting Jasso's racially offensive remarks. The same standard governs claims of retaliation under Title VII, section 1981, and the Texas Labor Code. *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 403–04 n.2 (5th Cir. 1999). To sustain her retaliation claim, Thompson must prove: (1) she engaged in a protected activity, (2) she was subjected to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). If Thompson establishes a prima facie case of retaliation, then StoneGate must "proffer a legitimate rationale for the underlying . . . employment action." *Id.* "If [StoneGate] makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Id.*

### A. The Retaliatory Termination Claim

StoneGate is entitled to summary judgment on Thompson's retaliatory termination claim. Even assuming that Thompson has presented a prima facie case of retaliatory termination, Thompson has not rebutted StoneGate's proffered nondiscriminatory reasons for her release. Hooper claims that his decision to terminate Thompson was based solely on her disruptive and insubordinate conduct on October 11, 2013. Hooper explains that Thompson's behavior "could not be condoned since it would potentially negatively affect employee morale and respect for authority within the Company." Defs.' App. 126. These considerations provided Hooper with legitimate nondiscriminatory reasons to dismiss Thompson. *Cf. Chaney v. New Orleans Public Facility Mgmt., Inc.*, 179 F.3d 164, 167–68 (5th Cir. 1999) ("The failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for discharging that employee.").

The fact that Thompson disputes StoneGate's account of her behavior on October 11 is irrelevant to what Hooper believed. Thompson maintains that she never raised her voice during the altercation, and that she was attempting to complete the referrals when Cloyd and Price began berating her and snatching papers from her desk. However, the relevant issue before the Court is not what actually happened on October 11, but rather what the decision-maker believed happened on that date. *See McVille v. Inter-Community Healthcare, Inc.*, 460 F. App'x 353, 355 (5th Cir. 2012) (holding relevant issue is "whether an employer discriminated against its employee, not whether it made a correct disciplinary determination"). Several witnesses reported that Thompson was very upset and yelling at her supervisors. One employee stated that she was concerned that Thompson's confrontation

with Cloyd would escalate into a physical altercation.  The employee also reported that Thompson put her hand up toward Cloyd and refused to speak with her.  These accounts gave Hooper a legitimate basis to believe that Thompson had acted in a disruptive and insubordinate manner.[4]

Thompson has not demonstrated that Hooper's belief of insubordination was pretextual.[5]  Because no genuine issue of fact remains on Thompson's claim for retaliatory termination, the Court grants summary judgment in favor of StoneGate on this claim.

### B. The Retaliatory Hostile Work Environment Claim

The Fifth Circuit has not expressly recognized a cause of action for retaliatory hostile work environment.  *See Tejada v. Travis Ass'n for the Blind*, 617 F. App'x 325, 328 (5th Cir. 2015) (declining to decide issue).  To establish a claim for discriminatory hostile work environment, however, a plaintiff must prove that she: "(1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of

---

[4]Thompson claims that Hooper gave Jasso preferential treatment and allowed her to resign in lieu of termination.  *See* Pl.'s Resp. 31–32.  After reviewing Thompson's proffered evidence, the Court concludes that Thompson has not created a genuine issue of material of fact on this issue.  At most, the record demonstrates that StoneGate Care Team rejected Jasso's tendered resignation.  *See* Defs.' App. 42, 85, 88.  Both women ultimately received the same treatment: suspension with pay followed by an internal investigation and ultimate termination.

[5]Thompson also contends that Cloyd and Price targeted other employees, including Demetria Coleman and Hurd, for raising objections to their discriminatory treatment of African Americans in the office.  *See* Pl.'s Resp. 33–34.  However, none of this alleged behavior implicates Hooper, the person with final decision-making authority at StoneGate.

ORDER – PAGE 9

employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). Thus, to establish a claim for *retaliatory* hostile work environment, the Court assumes that Thompson must show at the very least that: (1) she engaged in protected activity, (2) she was subjected to unwelcome harassment, (3) the harassment complained of was based on her engagement in protected activity, (4) the harassment complained of affected a term, condition, or privilege of employment, (5) StoneGate knew or should have known of the harassment in question and failed to take prompt remedial action. *See Tejada v. Travis Assoc. for Blind*, 2014 WL 4165370, at *4 (W.D. Tex. 2014).

Moreover, to be actionable, the harassment complained of must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson*, 286 F.3d 264, 267 (5th Cir. 2002) (internal quotation marks and citations omitted). "[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" are all relevant considerations in determining whether the harassment is sufficiently severe or pervasive. *Id.* (internal quotation marks and citations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Finally, a valid claim for retaliation must relate to employer actions that are "materially adverse to a reasonable employee or job applicant." *Burlington Northern and*

ORDER – PAGE 10

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  In other words, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* at 68.

Thompson argues that she experienced numerous incidents of harassment after filing her complaint against Jasso.  Thompson contends that Cloyd intentionally promoted her to a position beyond her experience level and provided her with inadequate training.  Thompson also maintains that Cloyd and other employees bullied and conspired against her in a successful attempt to force her departure from StoneGate Care Team.  Thompson claims that Price participated in this conspiracy by enacting policies designed to isolate her from her peers and making a racially disparaging remark about an African American.

These alleged changes to Thompson's conditions of employment do not amount to harassment that was sufficiently severe, pervasive, or materially adverse to sustain Thompson's claim for retaliatory hostile work environment.  First, Cloyd warned Thompson about the demands of the Intake Coordinator position, and Thompson has not submitted any proof that she was trained less than previous Intake Coordinators.  Second, Thompson has provided proof of only two instances where her supervisors made racially insensitive remarks, including Cloyd's out-of-earshot description of Thompson as "ghetto" or "hood" and Price's comments about her daughter.  Such isolated incidents do not rise to the level of severe or pervasive discrimination. *See, e.g.*, *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348–49 (5th Cir. 2007) (rejecting hostile work environment claim where supervisor's racially insensitive remarks were infrequent and isolated).  Finally, the so-called

ORDER – PAGE 11

bullying and isolation tactics that Cloyd and Price employed do not amount to the kind of physically threatening or humiliating conduct that can sustain a claim for retaliation. *See, e.g.*, *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 484–85 (5th Cir. 2008) (holding poor treatment by supervisors, denial of requested break times, and assignment to physically "tough" work were collectively no more than "petty slights" that would not support retaliation claim).

As much as Thompson's coworkers may have resented her for reporting Jasso, the Court must focus on the effect their actions would have had on a reasonable worker under the same circumstances. *See Burlington*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). The Court holds that the actions of Cloyd, Price, and others would not have deterred a reasonable employee from reporting a coworker's racist remarks to her supervisor. Finding no genuine issue of material fact as to Thompson's claim for retaliatory hostile work environment, the Court grants summary judgment in StoneGate's favor on this claim.[6]

C<span style="font-variant:small-caps">ONCLUSION</span>

The Court grants StoneGate's motion for summary judgment and denies Thompson's motion for leave. The Court denies all claims against StoneGate. The Court denies StoneGate's motion to strike as moot.

---

[6]Because the Court holds that StoneGate is entitled to summary judgment on all of Thompson's claims, the Court does not address Thompson's "single employer" argument.

Signed August 10, 2016.

_____
David C. Godbey
United States District Judge

ORDER – PAGE 13